UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2004 APR 14  P 3: 22

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| BOXCAR MEDIA, LLC, and RACEWAY MEDIA, LLC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| REDNECKJUNK, LLC, DR. THOMAS P. CONNELLY, and CONNELLY RACING, INC., | ) ) ) ) ) |
| Defendants. | ) ) |

CIVIL ACTION NO. 04-40051-NMG

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

The plaintiffs, Raceway Media, LLC ("Raceway") and Boxcar Media, LLC ("Boxcar")

seek a preliminary injunction to prevent the defendants, RedneckJunk, LLC, Connelly Racing,

Inc., and/or Dr. Thomas P. Connelly (hereafter collectively referred to as "defendants" or

"RedneckJunk"), from continuing to mislead consumers and harm plaintiffs' business by using

business names confusingly similar to plaintiffs' trademarks as well as to stop defendants from

any further misappropriation of content and customers from plaintiffs' internet web sites.  In

launching their competing business, defendants not only chose an infringing name, they literally

took plaintiffs' business by copying the customer advertisements off of plaintiffs' site and onto

their own.  Defendants' activities have created multiple instances of actual consumer confusion

and will continue to mislead consumers and harm plaintiffs' trademarks and business if

defendants are not stopped.

Plaintiffs are the proprietors of businesses and web sites known as RacingJunk.com,

BoatingJunk.com and RvJunk.com.  These web sites match buyers and sellers of, respectively,

automobile racing, boating and RV (recreational vehicle) supplies and equipment. The distinctive trademarks associated with these sites are well known in the racing, boating and RV communities and are associated with one source, plaintiffs.

In January, 2004, defendants sought to invest in or otherwise become involved in plaintiffs' business. When plaintiffs rebuffed their offer, defendants set up an identical business matching buyers and sellers of racing, boating and RV equipment. Unfortunately, defendants were not content to legally compete with plaintiffs' business. Instead, they have tried to appropriate plaintiffs' business for themselves. They selected the confusingly similar and infringing names "redneckjunk.com" and "rjunk.com" for the business and then literally copied the advertisements from plaintiffs' web sites to their own. There have already been multiple instances of actual consumer confusion and there will continue to be consumer confusion and harm to plaintiffs' business and trademarks if defendants are not stopped. Since plaintiffs' efforts to resolve this matter cooperatively have failed and defendants' activities are causing plaintiffs substantial and irreparable harm, plaintiffs ask the Court to enjoin defendants on an emergency basis from any further use of tradenames confusingly similar to plaintiffs' trademarks and any further misappropriation of material from plaintiffs' web sites.

## FACTS

I.    THE PLAINTIFFS' BUSINESS AND TRADEMARKS

Raceway operates a well known and well regarded business and website known as "RacingJunk.com" or "RacingJunk." The business connects buyers and sellers of racing related parts and supplies, and provides a communication forum for the racing community. Raceway earns revenue through commissions from the advertisements placed on its site. RacingJunk.com has been in existence since 1999 and is well known nationwide to fans and participants in the

2

automobile racing community including, without limitation, NASCAR fans and participants. (Affidavit of Osmin Alvarez ("Alvarez Aff."), ¶¶ 3, 9.)

Boxcar, an affiliate of Raceway, operates related businesses and web sites known as "BoatingJunk.com" and "RvJunk.com."[1] The former matches buyers and sellers of boating equipment and the latter matches buyers and sellers of recreational vehicle ("RV") equipment. These businesses have been in existence since 2000 and are also well known by their trademarks to their respective consumer communities (Alvarez Aff. ¶ 5).

II.     PROMOTION OF PLAINTIFFS' TRADEMARKS

Raceway promotes the trademark RacingJunk.com through the web site as well as through other promotional activities. For example, the trademarks are marketed and advertised through promotional items such as hats, shirts, and decals. (Alvarez Aff. ¶ 7 and Exhibit A.) These items are sold on the web site, given as gifts to advertisers and also worn by Racingjunk personnel at race events. The BoatingJunk.com and RvJunk.com trademarks are likewise promoted at their respective web sites and on the RacingJunk.com web site. (Alvarez Aff. ¶¶ 6, 7, 8).

The trademarks are also promoted through sponsorship of cars in automobile races. For example, on March 6, 2004, RacingJunk.com sponsored an automobile driven by Carl Long in a NASCAR race known as the UAW-Daimler Chrysler 400. That race was broadcast on Fox TV. Pictures of that very prominent sponsorship advertisement are attached as Exhibit B to the Alvarez Affidavit (Alvarez Aff. ¶ 9 and Exhibit B). As a result of these promotional activities over a five year period the trademarks RacingJunk.com and the related trademarks BoatingJunk.com and RvJunk.com are extremely well known to the relevant consumer group

---

[1] "BoatingJunk.com" is also known as and referred to as "BoatingJunk" and "RvJunk.com" is likewise also known as and referred to as "RvJunk." Throughout this memorandum reference to RacingJunk.com, BoatingJunk.com and RvJunk.com are also intended to include the shortened version of the trademarks.

3

and associated with one source, plaintiffs. Accordingly, these brands or trademarks are extremely valuable assets of Raceway and Boxcar. (Alvarez Aff. ¶ 10).

III.    DEFENDANTS' EFFORTS TO BECOME INVOLVED IN PLAINTIFFS' BUSINESS.

This is not a case where a defendant inadvertently stumbled upon an infringing trade name. On the contrary, defendants were very aware of plaintiffs' business and trademarks. In January 2004, Dr. Connelly contacted Boxcar about a potential business relationship between the defendants and RacingJunk.com, BoatingJunk.com. Connelly knew specifically about the trademarks and their value. Indeed, in a written proposal submitted by Connelly to Boxcar, he talked about "creat[ing] an equitable opportunity for RacingJunk, BoatingJunk or RvJunk" by permitting these entities to advertise on racing cars or uniforms. (Alvarez Aff. ¶¶ 11-13, and Exhibit C.) In other words, Connelly was trying to offer plaintiffs a business opportunity that concerned promotion of the very trademarks at issue. In late January 2004, Raceway and Boxcar ultimately rejected Connelly's overtures. (Alvarez Aff. ¶ 13.)

IV.    DEFENDANTS' SELECTION AND USE OF THE INFRINGING MARK

On or before January 26, 2004, when Connelly learned that Boxcar was not interested in pursuing a business relationship with him, Connelly embarked on a different plan. Purportedly acting through an entity called RedneckJunk, LLC, the defendants started a competing (and identical business) to plaintiffs' businesses. Defendants started a web site and launched a business known as "RednjeckJunk.com" matching buyers and seller of racing, boating and RV equipment. (Alvarez Aff. ¶¶ 14, 15.) There is only one conceivable reason for defendants to use "junk" in their business name: to try to mislead consumers and to trade on or piggyback on the recognition and goodwill that plaintiffs have amassed over a period of years.

V.    DEFENDANTS' MISAPPROPRIATION OF PLAINTIFFS' CUSTOMERS AND WEB SITE CONTENT

4

Defendants were not even content with misappropriation of plaintiffs' brands, they also literally took the content of plaintiffs' business and the source of its revenue. When they launched their "RedneckJunk.com" site, defendants took nearly all of the advertisements from RacingJunk.com and simply copied them onto their site. (Alvarez Aff. ¶¶ 26-33.) They also copied a substantial number of advertisements from BoatingJunk.com and RvJunk.com. Numerous examples of the copying are detailed in Mr. Alvarez's Affidavit. (Alvarez Aff. ¶¶ 26-33.) After receiving a demand letter from plaintiffs, defendants claim to have "confirmed" permissions for the advertisements that remain on their site. (Alvarez Aff. ¶ 34.) However, even if that is true,[2] the damage is done. Defendants have improperly diverted customers to its infringing site, as well as harmed plaintiffs' reputation with its customers. (Alvarez Aff. ¶¶ 26-34.)

VI.    ACTUAL AND LIKELY CONTINUED CONFUSION

There can be no question in light of the facts set forth above that defendants intended to confuse and mislead customers. They succeeded. For example, on Sunday, March 6, 2004 in the UAW-Daimler Chrysler 400 race at which RacingJunk.com had sponsored a car driven by Carl Long, RedneckJunk ran a prominent advertisement for its business on a competing race car driven by Derrike Cope. (Alvarez Aff. ¶ 17, Exhibit F.) At the race, participants asked Raceway personnel whether RacingJunk.com and RedneckJunk.com were associated with or related to one another. (Alvarez Aff. ¶ 18.) After the race, Raceway received an inquiry about its purported sponsorship of the Derrike Cope car sponsored by RedneckJunk.com. (Alvarez Aff. ¶ 19.)

VII.    TARNISHMENT AND DEFENDANTS' PURPORTED NAME CHANGE

---

[2] Defendants have now removed many of the advertisements that they copied from plaintiffs' site. Plaintiffs have no way to confirm at the present time whether or not defendants have received permission to run the advertisements which remain.

Even apart from the consumer confusion, this type of association is very damaging to Raceway and Boxcar because the term "redneck" is a very derogatory term on the racing circuit.

Indeed, NASCAR refused to permit RedneckJunk.com to sponsor a car at an Atlanta Motor Speedway race on March 13, 2004 because, according to a NASCAR spokesman, "[w]e just didn't feel like that projected the proper image of our sport." (Alvarez Aff. ¶¶ 21, 22 and Exhibit I.) Again, in an incident of actual confusion, someone sent an email to Racingjunk.com disagreeing with the NASCAR decision to not permit Racingjunk to advertise. In response to the NASCAR decision, RedneckJunk.com claims to have changed its name to "rjunk.com." (Alvarez Aff. ¶ 23 and Exhibit J.) As a threshold matter, the RedneckJunk.com site still contains numerous references to RedneckJunk.com. Indeed, it still prominently offers RedneckJunk.com promotional items – hats and shirts identical to RacingJunk.com promotional items. (Alvarez Aff. ¶ 24). Further, "rjunk.com" is, if anything, more likely to be confused with plaintiffs' trademark, it looks and sounds like a shortened version of plaintiffs' trademark.

VIII.    IRREPARABLE HARM

There has already been substantial and irreparable harm to plaintiffs' business and trademarks including without limitation: consumer confusion about the source of plaintiffs' services, the association of plaintiffs' marks with the derogatory term "redneck" and the literal misappropriation or conversion of plaintiffs' customers and revenue. Defendants have refused to stop their activities in the face of a demand letter and in the face of a lawsuit. Accordingly, plaintiffs have filed this emergency motion to stop the assault on their trademarks, business and reputation.

## LEGAL ANALYSIS

I.    STANDARD OF REVIEW.

6

A preliminary injunction is properly issued when the moving party shows: "(1) a likelihood of success on the merits; (2) that irreparable harm will result from the denial of the injunction; and (3) that, in light of the [moving party's] likelihood of success on the merits, the risk of irreparable harm to the [moving party] outweighs the potential harm to the [nonmoving party] in granting the injunction." <u>Loyal Order of Moose, Inc. v. Board of Health of Yarmouth</u>, 439 Mass. 597, 601 (2003) (internal citation omitted). As discussed below, the Plaintiffs amply satisfy each of these tests for a preliminary injunction.

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

A.    <u>Plaintiffs Will Succeed on Their Common-Law Trademark Infringement Claim</u>.

The Massachusetts common law doctrine of unfair competition comprehends an action for the copying of trademarks and other features of a product or service that is likely to result in confusion as to source. <u>Datacomm Interface, Inc. v. Computerworld, Inc.</u>, 396 Mass. 760, 768-69 (1986). In this case, the features of the plaintiffs' service include the trademarks used by the plaintiffs to identify their business. Moreover, the defendants' copying of these trademarks (as well as other features of the plaintiffs' services, such as the actual consumer content of the plaintiffs' website) is likely to cause confusion. Accordingly, the plaintiffs are likely to succeed on this claim, as discussed below.

1.    **Plaintiffs are the owners of valid trademarks.**

Plaintiff Raceway owns and operates a well-known business and web site known as "Racing Junk" and/or "Racing Junk.com." The business connects buyers and sellers of racing related parts and supplies and provides a communication forum for the racing community. The RacingJunk marks have been in existence and have been promoted since 1999 and they are well known throughout the automobile racing community, among both participants and fans. Plaintiff Boxcar operates related business and web sites known as "BoatingJunk" and/or

"BoatingJunk.com" and "RVJunk" and/or "RVJunk.com." These trademarks and businesses have been in existence and promoted since 2000 and provide the same services as RacingJunk.com, except with respect to boating and recreational vehicle supplies and equipment, respectively. Accordingly, the Plaintiffs own the trademarks "RacingJunk," "RacingJunk.com," "BoatingJunk," "BoatingJunk.com," "RVJunk," and "RVJunk.com."

Moreover, the terms "RacingJunk," "RacingJunk.com," "BoatingJunk," "BoatingJunk.com," "RVJunk," and "RVJunk.com" are suggestive and accordingly are entitled to trademark protection immediately on use without proof of secondary meaning. Equine Technologies, Inc. v. Equitechnology, Inc., 68 F.3d 542, 544 n.2 (1st Cir. 1995). A trademark is considered suggestive "if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." Id. at 544. This is in contrast to descriptive trademarks, which "convey[] an immediate idea of the ingredients, qualities or characteristics of the goods." Id.

The trademarks "RacingJunk," "RacingJunk.com," "BoatingJunk," "BoatingJunk.com," "RVJunk," and "RVJunk.com" do not describe the services offered by the plaintiffs. The web site in no way, shape or form advertises "junk," which is defined as: "1. Discarded material, such as glass, rags, paper, or metal, some of which may be reused in some form. 2. *Informal* a. Articles that are worn-out or fit to be discarded: *broken furniture and other junk in the attic.* b. Cheap or shoddy material. c. Something meaningless, fatuous, or unbelievable: *nothing but junk in the annual report.* 3. *Slang* Heroin. 4. Hard salt beef for consumption on board a ship." See The American Heritage Dictionary of the English Language: Fourth Edition, 2000.

Nor does "junk" describe forums for communication between persons with similar interests. Thus, taken in each of their entireties[3], the trademarks "RacingJunk," "RacingJunk.com," "BoatingJunk," "BoatingJunk.com," "RVJunk," and "RVJunk.com" do not describe the services offered by the plaintiffs.[4] Because the plaintiffs' trademarks are suggestive they are entitled to protection.[5]

> 2.    **Defendants are using marks similar to the plaintiffs' trademarks**.

As discussed below in Section II.A.3.b.i, the marks used by the defendants are confusingly similar to the plaintiffs' trademarks.

> 3.    **Defendants' use of the infringing marks has caused actual confusion and is likely to continue to cause confusion.**

>> a.    *Defendants' unequivocal intent to copy plaintiffs' trademarks entitles plaintiffs to a presumption of likelihood of confusion.*

When RedneckJunk's efforts to invest in or become involved in plaintiffs' business failed, RedneckJunk intentionally set out to copy the plaintiffs' trademarks and to appropriate

---

[3] Although the services with which the marks are associated are related to racing, boating and RVs respectively, in determining whether a mark is suggestive, the trademark must be looked at in its entirety. Equine Technologies, 68 F.3d at 544.

[4] Further, the use of these trademarks leaves competitors "with a variety of terms to describe their competing services." Public Serv. Co. v. Nexus Energy Software, Inc., 36 F. Supp. 2d 436, 439 (D. Mass. 1999) (finding that availability of alternative names to competitors favored finding a mark suggestive rather than descriptive). There are limitless business names available to defendants that would have evoked their services. For examples: racinggear, rgear, racinggaragesale, racing stuff, rstuff, etc. Defendants chose "redneckjunk" and "rjunk" for one reason to trade on plaintiffs' reputation and goodwill.

[5] Even if the Court found that the trademarks in question to be descriptive of the services offered by the plaintiffs, those trademarks are still entitled to protection because plaintiffs have shown that the term has acquired secondary meaning. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 41-42 (1st Cir. 1998). Factors that courts normally look to in determining secondary meaning include: "(1) the length and manner of [the mark's] use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture." Boston Beer Co. v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 182 (1st Cir. 1993). Other factors include "the product's established place in the market and proof of intentional copying." Lund at 42. The plaintiffs' long-term use and prominent of their trademarks and the defendants' actions recognizing the value of those trademarks both in trying to assist in promotion of them and then copying them (as discussed with regard to the strength of the plaintiffs' trademarks, see Section II.A.3.b.viii, below) demonstrate secondary meaning.

plaintiffs' business. Such conduct creates a rebuttable presumption that there is a likelihood of confusion between the services. <u>Boston Athletic Ass'n v. Sullivan</u>, 867 F.2d 22, 34 (1st Cir. 1989) (where defendant intentionally copies trademark, likelihood of confusion is presumed).

That RedneckJunk intended to copy, and, indeed, to create confusion with, the plaintiffs' marks is absolutely clear from their conduct as described above, including: (1) the past history of the parties' relationship, in which the defendants acknowledged the value of the plaintiffs' marks, (2) the defendants' selection, after their investment plans failed, of confusingly similar marks for their services, (3) the defendants' identical advertising at venues identical to those used by the plaintiffs, and (4) the defendants' theft of the content from the plaintiffs' website, the very business value represented by the plaintiffs' marks. The Court need go no further to determine that the defendants accomplished what they set out to do – cause a likelihood of confusion. Nevertheless, there is ample additional evidence, as discussed below.

> b. *In addition to the presumption of likely confusion, application of the eight factor analysis set forth by the First Circuit likewise favors plaintiffs.*

In analyzing whether there is a likelihood of confusion between trademarks, the First Circuit adopted an eight factor test in <u>Boston Athletic Ass'n</u>, 867 F.2d at 29. These factors are:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

<u>Id.</u> A discussion of each of these factors follows.

> (i) Similarity of the marks.

The marks "RedneckJunk," "RedneckJunk.com," and "rjunk.com" are sufficiently similar to the marks "RacingJunk," "RacingJunk.com," "BoatingJunk," "BoatingJunk.com," "RVJunk," and "RVJunk.com" that customers could find the "total effect" of the marks to be

confusingly similar. <u>Star Financial Servs. v. Aastar Mtg. Corp.</u>, 89 F.3d 5, 10 (1st Cir. 1996).
All the marks make prominent use of the word "junk"; it would be reasonable for a customer to
assume that the marks used by the defendants were either additional marks used by the plaintiffs
or that the plaintiffs replaced one or more of their marks with the "Redneck" marks. Indeed, this
confusion has occurred.

   In particular, RedneckJunk's change of the name of its website to "rjunk.com" enhances
the similarity between its marks and those of the plaintiff. Courts have repeatedly found that
marks are confusingly similar where one can be mistaken for a shortened or "telescoped" version
of the other. <u>See Eaton Allen Corp. v. Paco Impressions Corp.</u>, 405 F. Supp. 530, 532 (S.D.N.Y.
1975) (finding "Super Type" and "Super Type-7" confusingly similar to "Super-Ko-Rec-Type");
<u>Thymo Borine Lab. v. Winthrop Chemical Co.</u>, 155 F.2d 402, 403-04 (C.C.P.A. 1946) (finding
"Thy-Rin" confusingly similar to "Thyractin"). Similarly, "Oxol" has been found confusingly
similar to "Oxydol," "Dishine" confusingly similar to "Dynashine," "Dutch Maid" confusingly
similar to "Dutchland Made," and "Blexin" confusingly similar to "Betaplexin." <u>Id.</u> (collecting
cases). Use of the mark "RJunk" can easily lead customers to believe that it is merely a
shortened version of *RacingJunk* and not RedneckJunk, therefore causing consumer confusion to
be even more likely.

(ii)     Similarity of the services.

   In this case, the parties provide identical services, as both match buyers and sellers of
racing, boating and RV equipment and supplies. Indeed, the defendants ensured that the services
were exactly the same down to the last word by lifting the content of the plaintiffs' website and
placing it on their own website. The fact that customers can look at the parties' web sites and not
be sure which party's site they are looking at shows why confusion is likely, and indeed
inevitable.

11

(iii – v) Similarity of the parties' channels of trade, advertising and
prospective purchasers;

In addition to the above, the nature of the parties' business is essentially identical. The
parties' "channel of trade" is to seek out individuals with an interest in racing, boating or
recreational vehicles, and to convince them to use an internet website-based service to be put in
touch with other individuals with similar interests for the sale of goods related to those interests.

Furthermore, both parties advertise through identical methods, including internet website
ads, identical types of promotional items, and the sponsorship of race cars. In fact, as discussed
above, these identical types of advertisements have appeared at the <u>same</u> race, showing a
complete overlap in the parties' target audience.

Finally, as discussed above, the "classes of purchasers" are the same; indeed, it is the
individuals who access the parties' websites and offer items for sale that constitute the "channels
of trade" for these businesses. And, again, the defendants not only have similar individuals using
their services, in many cases they have the <u>same</u> individuals, as a result of the defendants'
copying of customer information from plaintiffs' site to their own without prior permission from
either the plaintiffs or their customers. (<u>See</u> Alvarez Aff., ¶ 29-31.)

Accordingly, all of these factors weigh in favor of a likelihood of confusion.

(vi)    Evidence of actual confusion.

Even if the above factors were not present, however, the most damning evidence of the
confusion caused by the defendants' wrongdoing is the actual confusion that they have already
caused among plaintiffs' consumers. <u>Planned Parenthood Federation v. Problem Pregnancy</u>, 398
Mass. 480, 489 (1986) (actual confusion "is the best evidence of likelihood of confusion").

Among other copious evidence of actual confusion, customers have contacted the
plaintiffs inquiring or commenting about their apparent sponsorship of the car that was actually

12

sponsored by the *defendants* at the UAW-Daimler Chrysler 400 on March 6, 2004. (Alvarez Aff., ¶¶ 19, 23 and Exs. G and J thereto.) Unsurprisingly, there was also actual confusion among customers who had placed advertisements on the plaintiffs' website, only to find those ads appearing on the defendants' website. (Id., ¶¶ 29-31 and Exs. O-R.)

The strong evidence of actual confusion which has occurred in this case is a clear indication that the defendants' marks have been, and are likely to continue to be, confused with the plaintiffs' trademarks.

                    (vii)    Defendants' intent to copy.

In addition to warranting a presumption of a likelihood of confusion, defendants' obvious intent to copy plaintiffs' marks is separately a factor that weighs in favor of finding a likelihood of confusion. See Boston Athletic Ass'n, 867 F.2d at 34-35.

                    (viii)    The strength of the plaintiffs' marks.

The strength of a mark is shown by, among other factors, "the length of time a mark has been used and the plaintiff's relative renown in its field . . . ; the strength of the mark in plaintiff's field of business, especially looking at the number of similar registered marks; and the plaintiff's actions in promoting its mark." Id. at 32 (internal citations omitted). The plaintiffs' trademarks "RacingJunk" and "RacingJunk.com" have been in continuous use since 1999, while the "Boating Junk," "BoatingJunk.com," "RvJunk" and "RvJunk.com" marks have been in use since 2000. Throughout this period, the plaintiffs have heavily promoted their marks through website ads, promotional items and highly-visible race car sponsorship, resulting in a high degree of consumer awareness. Indeed, the recognizability and value of these marks was recognized by the defendants when they sought to become part of the plaintiffs' business, and

13

then when they intentionally copied the plaintiffs' marks [6] Considering these factors, the

plaintiffs' trademarks are strong.

Under each and every one of the factors listed above, there is an extremely high

likelihood of consumer confusion between the defendants' marks and the plaintiffs' trademarks.

Accordingly, the plaintiffs are likely to prove a likelihood of confusion, and succeed on the

merits of their infringement claim.

B.    Plaintiffs Will Succeed on Their Lanham Act Claim.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  It provides, in pertinent part, the

following:

> Any person who . . . uses in commerce . . . any false designation of origin, false or
> misleading description of fact, or false or misleading representation of fact which
> . . . in commercial advertising or promotion misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another person's
> goods, services, or commercial activities, shall be liable in a civil action by any
> person who believes that he or she is or is likely to be damaged by such act.

See 15 U.S.C. § 1125(a).

The U.S. Court of Appeals for the First Circuit has held that the elements of a Lanham

Act claim are (1) the defendant has made false or misleading statements as to his own services

[or another's]; (2) that there is actual deception or at least a tendency to deceive a substantial

portion of the intended audience; (3) that the deception is material in that it is likely to influence

purchasing decisions; (4) that the advertised services involved in interstate commercial activities;

and (5) that there is a likelihood of injury to the plaintiffs in terms of declining sales, loss of good

will, etc.  See Clorox Co. Puerto Rico v. Procter & Gamble, 228 F.3d 24, 33 n.6 (1st Cir. 2000).

The defendants' wrongful conduct satisfies each of these elements.

---

[6] Further, plaintiffs are unaware of any other similar business which uses the term "junk" in its business name.

First, the defendant has made false and misleading statements as to the services it offers on its website, by identifying those services with a mark that has caused, and is likely to cause, confusion among the intended consumer audience, as discussed above. Second, such confusion is deceptive, as it leads consumers into believing that they are dealing with the plaintiffs when they are not. Third, this deception will clearly affect purchasing decisions, as customers who intended to use the plaintiffs' services may never reach the plaintiffs' website; alternatively, customers could be dissuaded from doing business with the plaintiffs by attributing to them the defendants' offensive use of the term "redneck." Fourth, both parties' services are available throughout the country via the internet. Fifth, the defendants' activities are not only likely to injure the plaintiffs sales and reputation, but that injury is likely to be irreparable, as discussed in Section III, below. Thus, the plaintiffs are likely to succeed on their Lanham Act claim.

C.    Plaintiffs Will Succeed on Their Massachusetts Common Law Palming Off Claim.

Under Massachusetts law, "'Palming off' or 'passing off' is an attempt to deceive the public into believing it is trading with one person when in fact it is dealing with another." Datacomm, 396 Mass. at 769. The Massachusetts doctrine of palming off comprehends an attempt to create "confusion as to the source of goods and services," and requires a likelihood of such confusion to succeed. See id. The doctrine also extends to attempts to confuse customers into believing that a plaintiff sponsored or endorsed the defendant's use of its marks, or that there is some other affiliation between the parties. Planned Parenthood, 398 Mass. at 489.

As discussed above, the defendants' intentional use of marks confusingly similar to the plaintiffs' marks is likely to confuse consumers into believing that they are dealing with the plaintiffs when they are not; indeed, such confusion has already occurred. Accordingly, the plaintiffs are likely to succeed on this claim.

15

D.    Plaintiffs Will Succeed on Their Claim for Interference with Contract and/or Advantageous Business Relationships.

Under Massachusetts law, "[c]laims of intentional interference with contractual or advantageous relations require a showing that the defendant knowingly and for an improper purpose or by improper means induced a party to breach a contract or not to enter into or continue a business relationship, resulting in damage." Buster v. George W. Moore, Inc., 438 Mass. 635, 652 (2003).

In this case, the plaintiffs' contractual and advantageous business relationships with their customers involve soliciting customers to advertise goods for sale on the websites identified by the plaintiffs' trademarks. The defendants have stolen the plaintiffs' business by literally lifting the advertisements placed by the plaintiffs' existing customers without the prior consent of either the plaintiffs or their customers, and by diverting further business by means of the use of infringing marks. The fact that some customers allegedly assented to the defendants' activity later, when presented with the theft of their advertisements as an accomplished fact, does not make the defendants' means any less improper. Rather, it only demonstrates the damage caused, as the defendants divert revenues that would have resulted from sales through the plaintiffs' service.

E.    Plaintiffs Will Succeed on Their Claim for Dilution and Tarnishment Pursuant to G.L. c. 110B, § 12.

Massachusetts General Laws chapter 110B, § 12 provides that:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Under this statute, the owner of a distinctive trademark can obtain injunctive relief where there is "injury resulting from a use of the mark that tarnishes the reputation associated with the

16

plaintiffs' mark." Hasbro, Inc. v. Clue Computing, Inc., 66 F. Supp. 2d 117, 137 (D. Mass. 1999) (internal citation omitted). In this case, by copying RacingJunk.com trademarks and advertisements onto its site, defendants have associated their marks with the derogatory term "redneck," causing tarnishment of the mark.

    F.    Plaintiffs Will Succeed on Their Chapter 93A Claim.

    M.G.L. c. 93A prohibits unfair or deceptive trade practices in trade or commerce. See M.G.L. c. 93A, § 2. Generally, a practice is unfair if it is "within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical, oppressive, or unscrupulous; . . . [and] causes substantial injury to [others]." See PMP Assoc. Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). The conduct described above constitutes a violation of G.L. c. 93A. See R.J. Toomey Co. v. Toomey, 683 F. Supp. 873, 879 (D. Mass. 1988) (finding that conduct which constituted violation of § 43(a) of the Lanham Act also constituted violation of G.L. c. 93A). Picciuto v. Dwyer, 32 Mass. App. Ct. 137, 138-39 (1992) (conduct arising to level of "improper purpose or improper means" of interference with prospective business relations also violated c. 93A); A.F.M. Corp. v. Corporate Aircraft Mgmt., 626 F. Supp. 1533, 1551 (D. Mass. 1985) (claim for interference with contract is clearly "within at least the penumbra of some common law . . . concept of unfairness" actionable under c. 93A).

    Moreover, the defendants' conduct violates specific regulations promulgated by the Attorney General's office pursuant to its authority under G.L. c. 93A, § 2(c). These regulations have the "force of law," and the violation of such regulations constitutes a violation of G.L. c. 93A. Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 765 (1980). In particular, the Attorney General has restricted advertising as follows:

        No statement or illustration shall be used in any advertisement which creates a
        false impression of the grade, quality, make, value, currency of model, size, color,
        usability, *or origin* of the product offered, or which may otherwise misrepresent

17

the product in such a manner that later, on disclosure of the true facts, there is a
likelihood that the buyer may be switched from the advertised product to another.
    Even though the true facts are subsequently made known to the buyer, the law is
violated if the first contact ... is secured by deception.

940 C.M.R. § 3.02(2) (emphasis added).  The defendants have created a false impression of

origin by using marks confusingly similar to the plaintiffs' trademarks in their advertising,

including but not limited to its race car advertisements at the UAW-Daimler Chrysler 400 and

advertisements on the defendants' website.  Accordingly, the defendants' use of its marks in its

advertising violates Chapter 93A.

III.   THE PLAINTIFFS WILL SUFFER SUBSTANTIAL AND IRREPARABLE HARM IF
       THE INJUNCTION IS NOT ALLOWED.

    In the trademark context, irreparable harm is presumed if a plaintiff demonstrates

likelihood of success on the merits of its claims.  "Having determined that there was a high

probability of consumer confusion . . . 'injury irreparable in the sense that it may not be fully

compensable in damages almost inevitably follows.'"  Camel Hair & Cashmere Inst. v. Assoc.

Dry Goods Corp., 799 F.2d 6, 14-15 (1st Cir. 1986).  See also Hypotherm, Inc. v. Precision

Prods., Inc., 832 F.2d 697, 699-700 (1st Cir. 1987) (Consumer confusion and uncertainty is "a

potent basis for a finding of irremediable injury.  Few harms are more corrosive in the

marketplace than the inability of a trademark holder to control the quality of bogus articles

thought (erroneously) to derive from it.  The threat of substantial damage to . . . hard won

business and reputation made out a sufficient showing of irreparable harm to warrant immediate

redress.")

    Even if irreparable harm were not presumed, there is ample evidence of it here.  Plaintiffs

have been associated in the minds of consumers with the derogatory term "redneck."  The fact

that NASCAR officials refuse to allow that name as a sponsor in its races demonstrates its

corrosive effect.  If defendants are not stopped, plaintiffs marks will be further tarnished and

18

their value diminished by this negative association. Further, defendants have caused and will continue to cause irreparable harm to plaintiffs' relationship to its customers by appropriating those customer advertisements from plaintiffs' web sites. Finally, defendants have caused actual consumer confusion and will likely cause continued substantial confusion.[7] If allowed to proceed, will irretrievably damage or even destroy the goodwill association with plaintiffs' trademarks.

IV.    THE DEFENDANTS WILL NOT BE HARMED BY THE ISSUANCE OF THE INJUNCTION.

In contrast, if the injunction is allowed, defendants will suffer no irreparable harm. They can simply change the name of their web site and business to a non-infringing one. This change is neither expensive or complex. Further, defendants assumed the risk of their actions in setting out to trade on plaintiffs' trademarks. Defendants were aware of plaintiffs' business and trade names. Indeed, they sought to invest in that business or to help plaintiffs promote those very brands. Defendants selected confusingly similar names for one purpose, to trade on plaintiffs' business reputation and they chose to proceed on that course even after receiving explicit notice of plaintiffs' claims. Accordingly defendants are estopped from claiming any harm and the balance of equities tips decidedly in favor of plaintiffs. See Aura Communications, Inc. v. Aura Networks, Inc., 148 F. Supp. 2d 91, 97 (D. Mass. 2001) (in light of actual confusion caused by defendants, balance of harms favored the plaintiff, even where the injunction would cause the defendant financial hardship).

V.    THE PUBLIC INTEREST SUPPORTS THE ISSUANCE OF THE INJUNCTION.

---

[7] As noted in the Alvarez affidavit, defendants are continuing with their web site and are apparently continuing with and expanding their sponsorship activities with the infringing names even in the face of this legal action. (Alvarez Aff. ¶ 25.)

The public interest favors the issuance of an injunction. Hypotherm, 832 F. 2d at 700

(public interest in favor of injunction in trademark action given "societal value of full disclosure

and fair competition"). This is particularly true where, as here, the public is being actively

misled by defendants' activities.

## CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that the Court issue a

preliminary injunction in the form set forth in plaintiffs' motion, enjoining defendants from using

"redneckjunk.com," "rjunk.com" or any other phrase confusingly similar to plaintiffs'

trademarks as well as from copying any content, and/or continuing to use any content copied,

from plaintiffs' web sites.

Respectfully submitted,

BOXCAR MEDIA, LLC and RACEWAY MEDIA, LLC,

by their attorneys,

Amanda C. Basta

Brenda M. Cotter (BBO #548004)
Jeffrey P. Hermes (BBO#637952)
Amanda C. Basta (BBO #655037)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111
Dated:  April 14, 2004          Tel.  (617) 856-8200

CERTIFICATE OF SERVICE

I, Amanda Basta , counsel for the plaintiffs, do hereby certify that on this day, April 14,

2004, I served a copy of the foregoing Memorandum of Law in Support of Plaintiffs' Emergency

Motion for a Preliminary Injunction and Request for Hearing by first-class mail and electronic

mail to counsel for the defendants:

Robert F. Casey, Jr., Esq.              Jean D. Sifleet, Esq.
ROBERT F. CASEY, JR., P.C.              120 South Meadow Road
Shaker Place                            Clinton, MA 01510
233 Ayer Road – Suite 12
Harvard, MA 01451


*Amanda C Basta*
Amanda C. Basta

Dated:  April 14, 2004

1270391# - 21073/2