UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BOXCAR MEDIA, LLC, et al. | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION NO. 04-40051-NMG |
| | ) | |
| REDNECKJUNK, LLC, et al. | ) | |
| Defendants. | ) | |

## MOTION FOR LEAVE TO FILE REPLY TO OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, AND MEMORANDUM IN SUPPORT

Plaintiffs Boxcar Media, LLC, and Raceway Media, LLC, hereby move for leave to file a reply to the Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction. In support of this motion, the plaintiffs state that the defendants' opposition is a confused blend of unsupported factual allegations and irrelevant argument, which displays a fundamental misunderstanding of the nature of trademark law and the claims asserted by the plaintiffs in this case. The plaintiffs therefore wish to file a short reply brief, in order to eliminate the confusion engendered by the defendants' opposition and demonstrate why nothing said therein affects the clear and compelling need for the injunctive relief sought by the plaintiffs.

WHEREFORE, the plaintiffs respectfully request that the Court grant the plaintiffs leave to file a reply brief in the form attached hereto as Exhibit 1.

Respectfully submitted,
BOXCAR MEDIA, LLC and RACEWAY MEDIA, LLC,
by their attorneys,

Brenda M. Cotter (BBO #548004)
Jeffrey P. Hermes (BBO#637952)
Amanda C. Basta (BBO #655037)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

Dated: May 3, 2004

1

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(A)(2)

I hereby certify that counsel for the plaintiffs attempted to contact defendants' counsel regarding the above motion, but did not hear from defendants' counsel prior to the time of filing this motion.

Brenda M. Cotter

## CERTIFICATE OF SERVICE

I, Jeffrey P. Hermes, counsel for the plaintiffs, do hereby certify that on this day, May 3, 2004, I served a copy of the foregoing document by mail and electronic mail to counsel for the defendants:

Robert F. Casey, Jr., Esq.
ROBERT F. CASEY, JR., P.C.
Shaker Place
233 Ayer Road – Suite 12
Harvard, MA 01451

Jean D. Sifleet, Esq.
120 South Meadow Road
Clinton, MA 01510

Jeffrey P. Hermes

Dated: May 3, 2004

#1273484 v\1 - hermesjp - r@mk01l.doc - 21073/2

2



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BOXCAR MEDIA, LLC, and<br>RACEWAY MEDIA, LLC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 04-40051-NMG |
| REDNECKJUNK, LLC,<br>DR. THOMAS P. CONNELLY, and<br>CONNELLY RACING, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

## REPLY TO DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs Boxcar Media, LLC and Raceway Media, LLC ("plaintiffs") herein reply to the opposition of defendants Redneckjunk, LLC, Thomas P. Connelly, and Connelly Racing, Inc. ("defendants") to plaintiffs' motion for a preliminary injunction. The defendants' opposition is a muddled blend of unsupported factual allegations and irrelevant and/or incorrect arguments, and displays a fundamental misunderstanding of the nature of trademark law and a bewildering misinterpretation of the claims asserted by the plaintiffs in this case. It is critical to note that defendants have not denied that they intentionally mimicked the plaintiffs' trademarks and they have admitted that they have copied advertisements from the plaintiffs' website without any permission. Moreover, the defendants have failed to present any factual or legal basis for denying the injunctive relief sought by the plaintiffs. Accordingly, as discussed below, a preliminary injunction should issue as requested by the plaintiffs.

1

<u>ARGUMENT</u>

I.    THE DEFENDANTS HAVE ADMITTED AND/OR FAILED TO OPPOSE THE
      ESSENTIAL ELEMENTS OF THE CLAIMS ASSERTED BY THE PLAINTIFF.

The defendants' opposition fails to rebut, and has affirmatively admitted, the critical facts

on which the plaintiffs' motion for a preliminary injunction is based.  For this reason alone, the

preliminary injunction requested by the plaintiffs should issue.  First, defendant Connolly admits

that the defendants were aware of the plaintiffs' trademark "racingjunk.com," and that he

intentionally selected the mark "redneckjunk.com" for his own website after the plaintiffs

refused to do business with him.  <u>See</u> Affidavit of Thomas P. Connelly ("Connelly Aff.," filed

with Defendants' Opposition) at ¶¶ 5-6.  He further admits that his attorney checked for a federal

registration for the plaintiffs' "racingjunk.com" trademark, demonstrating his awareness of the

potential confusion between the two marks.  <u>Id.</u> at ¶ 6.[1]  In short, Connelly does not dispute that

he intentionally set out to use a mark confusingly similar to the plaintiffs' trademark.

Furthermore, the defendants have admitted that they copied the advertisements placed by

the plaintiffs' customers on the plaintiffs' site without prior permission from the customers to do

so.  <u>See</u> <u>id.</u>, ¶ 11.  The defendants have thus admitted the factual basis for all of the relief sought

by the plaintiffs, and on the basis of these admissions, this Court would be justified not only in

granting a preliminary injunction, but in granting summary judgment as to liability and moving

directly to an assessment of the damages caused by the defendants' tortious acts.

---

[1] Of course, the defendants' suggestion that they could infringe with impunity on the basis of such a search despite their express and admitted knowledge of the existence of the plaintiffs' trademarks has no basis in the law; as discussed in Section II, below, the absence of a federal registration has no bearing on the existence of trademark rights.

2

II.    FEDERAL REGISTRATION IS NOT REQUIRED TO PROTECT TRADEMARK
RIGHTS.

Unable to deny that they have done precisely what the plaintiffs have alleged, the

defendants' brief misstates or misapprehends the law applicable to the plaintiffs' claims. At best,

these arguments represent a serious misunderstanding of the law, and at worst are a sanctionable

violation of the obligation not to advance frivolous arguments in bad faith.

The most striking instance of such misguided argument is the defendants' suggestion that

the plaintiffs do not have cognizable trademark rights because they have not registered their

trademarks. Apparently, according to the defendants, trademarks only exist if they are federally

registered or if registration has been sought. This argument is plainly, unequivocally and

absolutely wrong. State and federal laws clearly protect unregistered trademarks. For example,

the Massachusetts common law doctrine of unfair competition comprehends an action for the

copying of trademarks, where copying is likely to result in confusion as to source. There is no

requirement of registration. See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass.

760, 768-69 (1986). See also Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 372 n.3 (1st

Cir. 1980) ("The Lanham Act does not pre-empt the states' ability to recognize and protect

trademark rights.").

Similarly, under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),

Any person who...uses in commerce...any false designation of origin, false or
misleading description of fact, or false or misleading representation of fact
which...in commercial advertising or promotion misrepresents the nature,
characteristics, qualities, or geographic origin of his or her or another person's
goods, services, or commercial activities, shall be liable in a civil action by any
person who believes that he or she is or is likely to be damaged by such act.

See 15 U.S.C. § 1125(a). Section 43(a) is "designed to reach, among other things, attempts to

appropriate the goodwill associated with a competitor's trademark[.]" Purolator, Inc. v. EFRA

3

Distributors, Inc., 687 F.2d 554, 561 (1st Cir. 1982). However, "[t]o make out a claim under §

43(a), a plaintiff need not show that its mark is registered[.]" Three Blind Mice Designs Co.,

Inc. v. Cyrk, Inc., 892 F.Supp. 303, 310 (D. Mass. 1995); see also Keebler, 624 F.2d at 372.

 The First Circuit has expressly rejected the argument that trademark rights do not exist

prior to federal registration; unlike copyrights and patents, "it is axiomatic that registration does

not create the underlying right in a trademark.  That right, which accrues from the use of a

particular name or symbol, is essentially a common law property right[.]" Boston Athletic Ass'n

v. Sullivan, 867 F.2d 22, 27 (1st Cir. 1989) (internal quotation marks omitted); see also In re

ECCS, Inc., 94 F.3d 1578, 1579 (Fed. Cir. 1996) ("[T]he most fundamental aspect of United

States trademark law [is] that trademark ownership and attendant rights are acquired in the

marketplace by use[.]").  The plaintiffs are entitled to protect their trademarks against the use of

infringing marks by the defendants, whether or not the plaintiffs' trademarks are registered; the

defendants' suggestion to the contrary is without merit.[2]

III. THE DEFENDANTS HAVE FAILED TO COMPREHEND THE TORTIOUS IMPACT
  OF THE THEFT OF CONTENT FROM THE PLAINTIFFS' WEBSITES.

 The defendants also mistakenly argue that the plaintiffs are attempting to assert copyright

protection for the content of their websites by means of the Lanham Act.  The plaintiffs have not

asserted any copyright claims, nor are they trying to obtain any copyright protection.  The

plaintiffs are not concerned with any proprietary interest in the precise text of the advertisements.

 Rather, by copying the content of the plaintiffs' website, the defendants have not taken

the words alone, but have stolen the business of the plaintiffs.  The advertisements lifted by the

defendants are not merely blocks of text, they represent the actual service provided by the

---

[2] Likewise, the fact that the defendants have applied to register their infringing mark is irrelevant.  Even if
defendants' mark were registered (and plaintiffs will take all necessary steps to prevent that from happening),
plaintiffs still have superior rights as the senior user.

4

plaintiffs – namely, the method by which the plaintiffs put their customers in contact with potential buyers. The tortious impact of the theft of the plaintiffs' business has nothing to do with the Copyright Act, and indeed is qualitatively unrelated to the particular form of expression used in the advertisements. See Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1164-65 (1st Cir. 1994) (Copyright Act does not preempt claim for misappropriation of trade secrets, where injury alleged is breach of confidentiality as opposed to "mere unauthorized copying."). Specifically, as discussed in the plaintiffs' motion, there is a separate cause of action both for interference with the plaintiffs' business relationships with their customers, and for unfair and deceptive trade practices under M.G.L. c. 93A. The defendants' conduct would be actionable under either theory even if they had changed the text of the advertisements so that they were not exact duplicates of the text on the plaintiffs' sites, and under either theory, the plaintiffs are entitled to injunctive relief.

Furthermore, by copying the content of the plaintiffs' website, the defendants have made their intent to trade on plaintiffs' trademarks and business even more apparent, and made it more likely that there will be actual confusion between the plaintiffs' trademarks ("RacingJunk," "racingjunk. com," etc.) and the defendants' infringing marks (e.g., "RedneckJunk," "redneckjunk.com," "rjunk" and "rjunk.com"). Indeed, the defendants' misappropriation of particular customer advertisements from plaintiffs' website was directly related to some of the instances of actual confusion demonstrated in the first Affidavit of Osmin Alvarez ("Alvarez Aff."). See Alvarez Aff., ¶ 32. Thus, like the defendants' recent revision of the color scheme of their site to match the plaintiffs' website, see Second Supplemental Affidavit of Osmin Alvarez; Affidavit of Ryan Maturski, the copying of the plaintiffs' content is compelling additional evidence of intent and a likelihood of confusion of the parties' marks.

5

IV.    THE DEFENDANTS HAVE FAILED TO REBUT THE PLAINTIFFS' SHOWING OF
       THE PROTECTIBILITY OF THEIR TRADEMARKS.

The defendants also claim that the plaintiffs' trademarks are not protectible against

trademark infringement because they lack inherent distinctiveness or secondary meaning.

However, they fail to cite any evidence or legal authority rebutting the showing of inherent

distinctiveness made in the plaintiffs' motion, and their unsubstantiated and conclusory

assertions are entitled to no weight.

The defendants' suggestion that "junk" is descriptive is false,[3] and, indeed, is belied by

their own actions and submissions. As a threshold matter, plaintiffs are not in the business of

selling junk. They are in the business of providing an advertising forum for the sale of

equipment. Thus, the mark is fanciful, or, at most, suggestive, as applied to the plaintiffs'

services and is accordingly inherently distinctive on its face. Further, the defendants' suggestion

is belied by their own argument. The defendants point to the fact that other companies have

successfully registered trademarks using the word "junk." Even if the existence of other marks

mattered to an analysis of inherent distinctiveness (which it does not), the existence of other

federally registered marks only highlights the protectability of the plaintiffs' trademarks.[4]

---

[3] Although the unadjudicated and unknown business relationships of two non-parties has no bearing on this case, the defendants' example of the co-existence of "OfficeMax" and "Office Depot" is instructive as to why their claim of non-infringement must fail. In the defendants' example, the two companies' marks overlap by the word "Office," which is arguably descriptive given their business of selling office supplies. Critically, they differ in the suffixes "Max" and "Depot," which are the non-descriptive, inherently distinctive elements of those marks. The situation in this case is precisely the reverse; the parties' marks are identical with regard to the inherently distinctive portion of the marks, "junk."

[4] Even were it necessary to consider the trademark registration statistics asserted by the defendants (it is not clear for what proposition these marks were submitted), a review of the search results on which they rely indicates that the defendants' opposition brief is seriously misleading to the Court. Defendants assert that there are "hundreds" of federal registrations containing the word "junk." This is untrue. Of the 300 listings for trademark registrations and applications provided by the defendants, 103 do not include the word "junk" in the mark, 115 others are listed as dead, and 36 others are applications as opposed to registrations. Of the 46 remaining registered marks, the uses of the term "junk" run the gamut from video games to restaurants to live musical performances; only six registrations relate to online goods or services, and none of those six relates to a business like that run by the plaintiffs. See Affidavit of Jeffrey P. Hermes, attached hereto as Exhibit A.

6

But the defendants' argument fails for yet another reason. Even if, hypothetically, it were necessary for the plaintiffs to show secondary meaning, the defendants have not articulated any argument or presented any evidence to challenge the plaintiffs' very substantial showing of secondary meaning in their factual submissions and original brief. See Alvarez Aff., passim; Memorandum in Support of Plaintiffs' Motion at pp. 9 n.5, 13-14. Accordingly, the defendants' argument fails.

V.    THE INFRINGEMENT OF THE PLAINTIFFS' TRADEMARKS IS PRESUMPTIVE EVIDENCE OF IRREPARABLE HARM, WHICH THE DEFENDANTS HAVE FAILED TO REBUT.

The defendants spend more than two and a half pages of their eight-page opposition suggesting that plaintiffs have not proven reduced profits with "quantitative exactitude" (e.g., by showing reduced traffic to the plaintiffs' website). Plaintiffs are not required to prove monetary damages in the context of a motion for a preliminary injunction in the trademark context. This is because monetary damages, even if established, cannot fully compensate for the pervasive and irreparable damage caused by consumer confusion. The defendants fail either to acknowledge or to address the holdings of the U.S. Court of Appeals for the First Circuit that a likelihood of confusion between the parties' marks is *presumptive evidence* of irreparable harm for this very reason. See Camel Hair & Cashmere Inst. v. Assoc. Dry Goods Corp., 799 F.2d 6, 14-15 (1st Cir. 1986) ("Having determined that there was a high probability of consumer confusion . . . 'injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows.'"); Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697, 699-700 (1st Cir. 1987) (Consumer confusion and uncertainty is "a potent basis for a finding of irremediable injury. Few harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it. The threat of

7

substantial damage to . . . hard won business and reputation made out a sufficient showing of irreparable harm to warrant immediate redress."). The plaintiffs have clearly established not only a likelihood of confusion, but multiple instances of **actual confusion**, and thus they have demonstrated irreparable harm.

The defendants' argument that they offered to place a disclaimer on their website does not change this fact. The plaintiffs' response to this offer, included in the exhibits to the defendants' opposition as Exhibit 7, provides the obvious response to this argument:

> We appreciate your attempt to find a way to avoid the confusion in this case. However, the solution you propose does not address a fundamental problem with your clients' actions, namely, that confused customers seeking the plaintiffs' websites will already be at the defendants' sites before they see the message you propose to add. While we do not believe that messages such as that you suggest are effective in any case, it is still an infringement of the plaintiffs' trademarks even to make customers aware of the defendants' sites by use of the infringing marks, even if some fraction of those customers then choose to switch back to the site they intended to reach all along.

See Ex. 7 to Defendants' Opposition. Moreover, the disclaimer would not appear on the racecars the defendants sponsor, the caps and T-shirts they sell, or the other methods of promotion they use.

Furthermore, the First Circuit's decision in WCVB-TV v. Boston Athletic Ass'n, 926 F.2d 42, 45 (1st Cir. 1991) is inapposite to the case at bar. In WCVB-TV, the First Circuit specifically noted that the issue was limited to confusion as to the *sponsorship* of the Boston Marathon and WCVB-TV's broadcast of the event; the parties were not competitors. See id. at 44-45. Here, the parties are competing to attract the attention of consumers for the same services, and, as discussed above, a mere disclaimer will not avert the harm and confusion that will already have occurred by the time customers reach the defendants' site.

8

VI.     THE FACT THAT THE DEFENDANTS HAVE CONTINUED TO PROMOTE THEIR
        INFRINGING MARKS AT THEIR OWN RISK IS ENTITLED TO NO WEIGHT.

Finally, and perhaps most outrageously, the defendants ask this Court not to enter an

injunction because the defendants, with full knowledge of the plaintiffs' trademarks and with

specific intent to trade on those marks, have promoted and continue to promote their infringing

marks. The defendants intentionally embarked on this activity and were on notice of plaintiffs'

claims within days of the launch of their business. They have likewise continued on this course

after this lawsuit was filed. They proceeded with this course of action entirely at their own risk.

Accordingly, the plaintiffs' clear and urgent need for the injunctive relief sought in this case is

paramount, and their motion should be granted.

Respectfully submitted,

BOXCAR MEDIA, LLC and
RACEWAY MEDIA, LLC,

By their attorneys,

Brenda M. Cotter (BBO #548004)
Jeffrey P. Hermes (BBO #637952)
Amanda C. Basta (BBO #655037)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

Dated: May 3, 2004

9

## CERTIFICATE OF SERVICE

I, Jeffrey P. Hermes, counsel for the plaintiffs, do hereby certify that on this day, May

_3_ , 2004, I served a copy of the foregoing document by mail and electronic mail to counsel for

the defendants:

Robert F. Casey, Jr., Esq.
ROBERT F. CASEY, JR., P.C.
Shaker Place
233 Ayer Road – Suite 12
Harvard, MA 01451

Jean D. Sifleet, Esq.
120 South Meadow Road
Clinton, MA 01510

Jeffrey P. Hermes

Dated: May _3_ , 2004

10



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOXCAR MEDIA, LLC, and RACEWAY MEDIA, LLC., ) ) ) ) | |
| Plaintiffs, ) | CIVIL ACTION NO. 04-40051-NMG |
| v. ) ) | |
| REDNECKJUNK, LLC, DR. THOMAS P. CONNELLY, and CONNELLY RACING, INC., ) ) ) ) | |
| Defendants. ) | |

## AFFIDAVIT OF JEFFREY P. HERMES

I, Jeffrey P. Hermes, do hereby depose and state as follows:

1.     I am an attorney admitted to the bar of this Court and an associate with the firm of Brown Rudnick Berlack Israels LLP. I presently represent Boxcar Media, LLC and Raceway Media, LLC in the above-captioned action.

2.     I have reviewed the papers filed by the defendants in connection with their Opposition to the Plaintiffs' Motion for a Preliminary Injunction, particularly the Affidavit of Dr. Thomas Connelly, which was attached as Exhibit A to the Opposition. In his affidavit, Dr. Connelly, a dentist, stated that there are hundreds of federally registered trademarks that include the word "junk." Affidavit of Dr. Thomas Connelly, ¶ 21 and Attachment 8. It is not clear for what purpose the defendants made this assertion, but because the assertion is false on its face, I submit this affidavit to present an accurate summary of the list of records submitted to the Court by Dr. Connelly.

3.     I reviewed Attachment 8, which apparently consists of a list of results from a search of the Trademark Electronic Search System ("TESS") for the word "junk." See Connelly Affidavit, Attachment 8. Although the document indicates that 312 records were found in

1

response to the search, the defendants have only provided a list of 300 of those records to the Court.

4.    Upon reviewing the 300 records set forth in the list provided by the defendants, I found that 103 of the marks listed did not, in fact, contain the word "junk." Another 115 of the marks were considered "dead" by the United States Patent and Trademark Office. Accordingly, there are 82 trademark registrations or pending applications that contain the word "junk."

5.    Of the 82 remaining marks, there are 46 (not "hundreds of") registered trademarks, and there are 36 pending applications for which no registration has issued.

6.    The 46 registered trademarks are listed on the chart attached hereto as <u>Exhibit 1</u>. As a review of the "Goods and Services" entries provided by the various registrants demonstrate, marks including the term "junk" have been applied to a wide variety of different goods and services, including but not limited to: tools for cleaning out wells; coin-operated pinball machines; direct marketing services in the field of videotapes; live musical performances; handcrafted jewelry; restaurant services; video games; and power tools.

7.    Of these 46 registrations, only six (6) involve goods and services offered over the internet. These six registrations involve the following businesses: (1) education and entertainment by means of a simulated securities exchange computer game (WHERE THE STARS TRADE LIKE JUNK BONDS, #2150493); (2) entertainment and non-fiction information relating to a television program (JUNKYARD WARS, #2591001); (3) an information network for blacksmiths (WINIKOFF KEEN JUNK, #2622540); (4) on-line antiques and collectibles retail sales (JUNK2ART, #2430005); (5) on-line resources for truck drivers, including job resources, truck driving schools and truck products (BUBBAJUNK, #2406408); and (6) an on-line index of salvage yards selling automobile parts (JUNK YARD

DOG, #2368401). None of these businesses offer services similar to the plaintiffs', namely, allowing customers to post internet advertisements for their own racing, boating and recreational vehicle goods, for purchase by other visitors to the site.

Signed under the pains and penalties of perjury this 3rd day of May, 2004.

_____

Jeffrey P. Hermes



| Registration Number | Mark[1] | Goods and Services |
|---|---|---|
| 1403765 | JUNK SUCKER | Well clean out tools, namely well borehole bailers. |
| 1517268 | MR. JUNKO | Men's and women's clothing, namely dresses, coats, pants, jackets, suits, sweaters, belts, shirts, blouses, scarves, mufflers, socks, shoes and neckties. |
| 1688408 | JUNK DRAWER ORGANIZER | Kitchen drawer insert tray with compartments specifically designed for organizing miscellaneous household items. |
| 1819167 | VIDEO JUNKMAIL | Direct marketing services for others in the field of video tapes. |
| 1933053 | JUNK FOR JOY | Retail and wholesale store services in the field of clothing. |
| 2107880 | BUCKET OF JUNK | Children's hobby craft kit comprising of [sic] plastic beads, foil mesh, tissue paper balloons, buttons, earrings, barrette, key chain, pipe cleaners, confetti, pom poms, cording, ribbon, lace, feathers, and yarn. |
| 2119708 | ZERO JUNK MAIL | Business services for member companies related to the systematic contacting of numerous organizations and companies involved in the sale, rental, use and dissemination of consumer information and protection of the privacy of member companies by having their personal information removed or suppressed from various databases. |
| 2130337 | JUNK YARD DOG | Protective gloves for industrial and commercial use. |
| 2133212 | JUNKBUSTERS | Consulting services directed to business and residential consumers in the field of controlling solicitations and data from marketing companies. |
| 2134665 | JUNK YARD | Coin-operated pinball machines. |
| 2144053 | FUNK & JUNK | Retail store services featuring collectibles and vintage clothes. |
| 2150493 | WHERE THE STARS TRADE LIKE JUNK BONDS | Education and entertainment services in the nature of a simulated securities exchange game accessible through a global computer information network for the transfer and dissemination of a wide range of information; and production and distribution for others of motion picture films, radio programs, and television shows. |
| 2213741 | WHERE THE STARS TRADE LIKE JUNK BONDS | Investing and market trading computer games in the nature of interactive multimedia computer game programs, computer game discs, computer game tapes, computer game cartridges, computer game cassettes, and computer game software; interactive video games of virtual reality comprised of computer software and computer hardware; electronic entertainment, namely, |

---

[1] Some of the listed marks are word marks, and certain are marks including stylized lettering and/or logos.

| | | |
|---|---|---|
| | | computer game software, video game software, and virtual reality game software; multimedia computer game recorded on CD-ROM in the field of investment and market trading; computer game software downloaded from a global computer network. |
| 2259402 | JUNK MUSIC | Entertainment services in the nature of live musical performances. |
| 2284963 | JUNKJAM | Entertainment services in the nature of live performances by a musical band in which participants use junk and/or recycled materials as instruments of music-making. |
| 2312236 | JUNK YARD DOG | Metal locking bars and metal padlocks for securing doors in the closed position. |
| 2315398 | FRIENDS DON'T LET FRIENDS DRIVE JUNK | Automobile dealerships and automobile parts and accessories retail stores. |
| 2316369 | 1-800-GOT-JUNK? | Cartage services, namely transporting material by truck for others. |
| 2357156 | THE JUNKMAN | Entertainment services in the nature of live musical performances. |
| 2368401 | JUNK YARD DOG | Providing an on-line computer database in the field of automobile salvage and automobile salvage yards. |
| 2406408 | BUBBAJUNK | Online computer services, namely, providing information regarding the goods and services in the nature of a buyers' guide, by means of a global computer network; computer services, namely, creating indexes of information, sites, and other resources available on computer networks for others; providing an online link to news, weather, sports, current events, and reference materials. |
| 2430005 | JUNK2ART | On-line retail store services featuring antiques and collectibles. |
| 2431861 | JUNKSTAR | Entertainment services in the nature of live performances by a musical group. |
| 2435543 | BUNK JUNK | Novelty gift kits for use by campers in the nature of plastic reusable water bottles containing children's gift items, namely, stationery, hair accessories, toys, clothing, costume jewelry and plush toys. |
| 2451684 | JUNKYARD DOG | Abrasive rotary cone and plug wheels for high-speed power tools. |
| 2472360 | JUNK TO JEWELS | Handcrafted jewelry. |
| 2492459 | SPIKE'S JUNKYARD DOGS | Restaurant Services |
| 2526503 | GIRL JUNK | Novelty gift kits for children in the nature of gift packages containing an assortment of trendy gifts, namely, stationery, pens, diaries, cameras, hair |

| | | |
|---|---|---|
| | | accessories, cosmetics, toys, costume jewelry, crafts, and plush toys. |
| 2534942 | MONKEY JUNK | Sports related products, namely bicycle lubricating oils. |
| 2577975 | 100% JUNK MAIL | Recycled paper and paper products —namely, stationery and envelopes. |
| 2581487 | JUNKYARD WARS | Entertainment services in the nature of a non-fiction television series. |
| 2589059 | JUNK FOOD | Men's, women's and children's clothing, namely t-shirts, tank tops, sweaters, muscle t-shirts, pants, shorts, skirts, dresses, sweatshirts, sleeves, and hoods. |
| 2591001 | JUNKYARD WARS | Providing entertainment and non-fiction information on topics related to a television program via a global computer network. |
| 2622540 | WINIKOFF KEEN JUNK | Providing information in the field of blacksmithing via a global computer network. |
| 2651850 | JUNK JUMPIN'S CHALLENGE | Toys, namely toy vehicles, toy track sets, and accessories therefor. |
| 2699877 | FAT ALBERT AND THE JUNKYARD GANG | Men's, women's and children's sportswear, namely woven and/or knit shorts, shirts, t-shirts, pants, jogging suits, coats, jackets, sweaters, sweatshirts and jeans. |
| 2709647 | JUNK YARD DOGS | Plush toys, namely, stuffed toy dogs, and stuffed toy dogs with electronic components allowing the toys to interact with children. |
| 2724241 | ANALOG JUNK | CD-ROMs, vinyl records, and DVDs featuring music; and interactive musical Entertainment software on CD ROMSs and DVDs. |
| 2764517 | JUNK JEANS | Clothing, namely jeans, jean jacket, shorts, pants and shirts. |
| 2768043 | JUNKYARD WARS | Pre-recorded audio and video cassettes and discs, pre-recorded videos and CD ROMS related to an on-going television program in the field of science and technology, and competitions relating thereto; digital recordings, namely digital audio and video recordings featuring prerecorded digital audio tapes, and pre-recorded compact discs all related to an on-going television program in the field of science and technology, and competitions relating thereto; prerecorded compact discs featuring an on-going television program in the field of science and technology, and competitions relating thereto. |
| 2779672 | LAURA'S WHOLESOME JUNK FOOD | Healthy snacks and desserts, namely cookies, cereal based snack food, ready to eat, cereal derived food bars, granola-based snack bars, puffed corn snacks, rice-based snack foods, snack mix consisting primarily of crackers, pretzels, candied nuts and/or popped |

| | | popcorn, wheat based-snack foods. |
|---|---|---|
| 2782453 | JUNKYARD | Skateboards for snow |
| 2798662 | JUNKBAG | Handbags. |
| 2802526 | JUNKAWAY | Cartage services, namely transporting material by truck for others |
| 2812492 | TOUGH AS A JUNK YARD DOG GUARANTEED | Wheels for vehicles and solid rubber tires for vehicles. |
| 2814108 | THE JUNK GYPSY | Clothing, namely, shirts, pants, and hats |